Action to recover damages for the wrongful cancellation of a policy of insurance. On 18 January, 1902, the defendant issued to the plaintiff a policy of insurance, in which it was provided that the premium should be $154.11, payable annually, and at the time and since then the insured had the right, under the by-laws of the defendant, upon notice, to change the premium from an annual to a quarterly premium. *Page 335 
Dr. M. E. Robinson, the plaintiff, testified as follows: "Mr. Van Noppen came down here about the time they were organizing this company, in January, 1902, and he said that he wanted to get some prominent men insured in this company so that he could get some insurance, and asked me to give him a few names. I did so, and he came back and said if I would give him some insurance he would give me enough medical examinations of applicants to pay the premium for the first year. He said that I could take out a policy with the premium of $154.11, payable annually in advance, or I could pay a (417) quarterly premium of $38.53. He made a calculation at the time. I told him that I would take it quarterly, and I have been paying this quarterly premium for ten years, until they merged this company with the Jefferson Standard and others, some time last year. Since then they came around and said they had made a mistake on my premium, which should have been $40.84, and that I would have to pay this amount in the future, or they would cancel the policy. He told me my quarterly premium would be $38.53, and I told him that I would take the quarterly premium, and have been paying it. I do not remember whether the first year's premiums were all paid out of medical service or not. I never did at any time pay $154.11 premiums in advance or any other way, as that receipt states. I wrote to Mr. Grimesly to draw on the Bank of Wayne for payment of the quarterly premiums of $38.53, and the company has drawn drafts for that amount every quarter for over ten years. I paid $38.53 quarterly until April, 1912, when the contention arose. The agent of the company filled out the application for the policy at that time. The agent told me that the premium would be $38.53 quarterly, and the company drew drafts for that amount for about ten years. I supposed that the policy set out our agreement correctly. I never made any complaint about the policy after I got it. There was an inducement offered us. I knew when I took out this policy that I was getting a special and material inducement as to the amount of premiums to be paid. I did not know that it was unlawful to take a policy under such inducements."
G. A. Grimesly testified as follows for defendant: "I was raised in Greene County and am secretary of the Security Life and Annuity Company. I became secretary in the early part of January, 1902. I kept the books of the company. The first annual premium on the policy of Dr. Robinson was paid in advance. The policy is dated 18 January, 1902, the same month I became secretary. It was the duty of the treasurer to call upon policyholders for their premiums after the policies were written and delivered. I called on Dr. Robinson as secretary, about eleven months after the policy was written. Dr. Robinson never made any complaint to the company about the (418) *Page 336 
terms of this policy, nor were there any objections sent or offered to the company on account of the provisions of the policy, that I ever heard of. The first objection I ever heard from Dr. Robinson to the provisions or terms of the policy was when he was given notice of the error in quarterly premium, some ten years after he had received the policy. The error in collecting this premium occurred as follows: We were collecting one-fourth of the regular annual premiums of $154.11, instead of the usual quarterly premium. As soon as we discovered, that, we attempted to correct it. The rules and regulations of the company are that the policies were written on an annual basis, that is, we charged an annual premium. The first year the agent was authorized to collect that premium. The annual premium is due in advance. If the policyholders elect to pay the quarterly premium instead of the annual premium, they may do so. The quarterly premium is not one-fourth of the annual premium with any company that I know of. The quarterly premium is made usually with all companies by adding 6 per cent to the annual premium and dividing by four. That is the deferred premium, and the interest is added to cover the cost of collecting. If he desires to pay semiannually, the custom is to add 4 per cent and divide by two. The error in Dr. Robinson's premium was discovered in April or May, 1912. I thereafter demanded of him the same amount that other policyholders for like insurance were paying, and no more. As soon as I notified Dr. Robinson of the mistake, he notified me that there was no mistake and of his agreement with Mr. Van Noppen. He wrote me a number of letters. From the time of the issuing of the policy up until the time of the discovery of the mistake, ten years afterwards, there was no complaint made by Dr. Robinson that I know of. We called on him for the payment of the annual premium, and he said he wanted to pay it quarterly. I do not think we drew drafts. I think Mr. Robinson's statement that he wrote me and requested me to draw on him was correct to the best of my recollection. I think he wrote me that he might be off on business and to draw on the Bank of (419) Wayne. I failed to draw for the proper amount."
At the conclusion of the evidence there was judgment of nonsuit, and the plaintiff excepted and appealed.
We will at the outset eliminate from the discussion the evidence as to the agreement with the agent of the defendant, and will assume that this agreement is merged in the written policy, under the authority of Floars v.Ins. Co., 144 N.C. 237. *Page 337 
Conceding this much, and treating everything as true which the evidence reasonably tends to prove, which is the established rule in passing upon judgments of nonsuit, it appears that the defendant issued its policy to the plaintiff in 1902, stating the annual premium to be $154.11; that the by-laws of the defendant gave the plaintiff the right, at his election, to change the premium from an annual to a quarterly premium; that after the policy was issued the defendant drew a draft on the plaintiff for the annual premium, and he said he wished to pay his premiums quarterly; that thereafter the defendant drew on the plaintiff quarterly for ten years for a quarterly premium of $38.53, which the plaintiff paid; that after the expiration of ten years the defendant demanded that the plaintiff pay a quarterly premium of $40.84, which he refused to do; that the policy was thereupon canceled; that the plaintiff knew he was paying a reduced premium, but he did not know that this was illegal, if it was so.
The reasonable inferences from these facts, and inferences which the jury had the right to draw, are that the policy was issued the plaintiff and defendant agreed to change it, acting under the authority of the by-laws of the defendant, and that for ten years the contract of insurance in existence was one to pay a quarterly premium of $38.53, and not an annual premium of $154.11.
If this was the contract, whether legal or illegal, the (420) plaintiff had the right to refuse to enter into a new contract at an increased premium, and no fault can be attributed to him in doing so.
This brings us to the consideration of the two questions chiefly debated in the oral arguments and the printed briefs:
1. Is the contract, which the evidence of the plaintiff tends to establish, legal?
2. If legal, can the plaintiff maintain his action to recover the premiums paid under it, when the defendant, relying upon the plea of illegality, refuses to perform the contract?
The defendant contends that the contract, as interpreted, is an unjust discrimination in favor of the plaintiff, and forbidden by Revisal, sec. 4775, which reads as follows:
"No life insurance company doing business in this State shall make any distinction or discrimination in favor of individuals, between insurants of the same class and equal expectation of life in the amount of payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any of the terms and conditions of the contracts it makes; nor shall any such company or any agent thereof make any contract of insurance or agreement as to such contract other than as plainly expressed in the *Page 338 
policy issued thereon; nor shall any such company or agent pay or allow as inducement to insurance any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefit to accrue thereon, or any valuable consideration or inducement whatever not specified in the policy contract of insurance."
This section of the Revisal is in all material respects like section 4773a, which was considered at this term in Blount v. FraternalAssociation, ante, 167, and should receive the same construction.
The statute does not invalidate the contract of insurance or the agreement of the parties, and it purports to operate upon the insurance companies alone.
It says, "No life insurance company shall make any distinction or discrimination," and fails to denounce as illegal a contract of insurance which gives a lower rate to the insured than to others, and it is (421) manifest that at least one of the purposes of the statute was for the benefit of the stronger insurance companies, by declaring that in soliciting insurance all companies should be on an equal footing, and that none should offer inducements below the published rates.
Mr. Vance, in his treatise on insurance, speaking of statutes imposing conditions upon insurance companies to do business, and regulating their contracts, says (pp. 86 and 87): "When, however, the statutes imposing conditions upon doing business by the foreign insurer merely prohibit the making of the contract without compliance with their terms, the question as to the rights of the parties becomes of much greater difficulty. In accordance with the general rule that a contract that is prohibited is illegal, and therefore void, it would follow that neither one of the parties would take any rights under the contract, or could enforce the agreement against the other. Yet to apply this general doctrine to a contract made under such circumstances as usually attend the making of a contract of insurance would work great hardship and be manifestly unjust. The party insured cannot, without great difficulty, discover whether the insurer has complied with all the statutory requirements or not; and while it is true that the statutes imposing these conditions upon the insurer are public acts, and therefore presumed to be known to all, yet it would be unreasonable to require that every person to whom a corporate insurer offers a contract of insurance should make an exhaustive investigation in order to discover whether his cocontractor has been fully qualified to make the agreement that is proposed, which is a question of fact. It would seem that the insured has a right to presume that the insurer has complied with all the requirements of law. Accordingly, it is held by the great weight of authority that when the insured attempts to enforce such a contract, made in good faith, against the unlicensed insurer, the latter will be estopped to escape liability *Page 339 
under the contract by pleading his own infraction of law. The same principle of estoppel, however, does not apply when the insurer is endeavoring to enforce some right under the contract against the insured. The plaintiff, not having legally qualified himself to make the contract under which he sues, has no standing in law or equity (422) when he attempts to enforce it."
Our case is stronger than the one covered by the quotation, as there is no statute which prohibits the contract made by the plaintiff.
We might, therefore, rest our decision on the legality of the contract, but it is not necessary to do so.
The contract is not immoral, and if illegal, it is so by reason of the provisions of the statute (Revisal, sec. 4775), and the action is not to enforce the contract, but to recover money received by the defendant under it, and after a refusal to perform.
The citation from Vance marks the difference in the relations of the parties to the contract under these circumstances, and demonstrates that they are not in equal fault.
It is there said "that the insured has the right to assume that the insurer has complied with all the requirements of the law," and that "the latter will be estopped to escape liability under the contract by pleading his own infraction of law," and that the insured may maintain an action upon the contract when the insurer cannot.
This principle is clearly recognized in several decisions in our Court, and notably in Herring v. Lumber Co., 159 N.C. 382; which in its essential features is almost identical with the one before us.
In that case the plaintiff and certain other neighboring landowners agreed to sell their timber to the defendant in consideration of the payment of a stipulated sum and the building of a standard-guage [gauge] railway from Delway to Wallace, and the contract provided for the payment of a penalty upon failure to build the railway. The plaintiff conveyed his timber, and, when the defendant refused to build the railway, sued for the penalty, and one of the defenses set up was that the contract for building the railway was illegal and forbidden by Revisal, sec. 2598.
The Court, in considering the contention of the defendant as to the illegality of the contract, says: "We need not decide whether or not this is a correct position, as we are of the opinion with the plaintiff upon another view of the matter. It appears in the case that the plaintiff and his neighbors, who joined with him in the agreement to sell their timber to the Wallace Manufacturing Company, one of (423) the defendants, were influenced in fixing the price of the same by the stipulation of the said company to construct this road, and that they sold the timber at much less than its reasonable worth because of this agreement, believing that if the road was built and put into *Page 340 
operation, the benefit or advantage they would derive therefrom would compensate them for the loss of the difference between the price charged by them for the timber and the real value thereof. This being so, it would seem to be very unjust and inequitable that the defendants should repudiate their agreement and rely on its invalidity for the purpose of evading the payment of a reasonable price for the timber; in other words, that they should be allowed to keep the amount of the difference between the price paid for the timber and its true value, and, at the same time, refuse to execute their part of the contract to build the road, even upon the ground that it is malum prohibitum. If the stipulation to construct the road is invalid, the plaintiff, if particeps criminis, is not in pari delicto. He can recover the amount of his loss without declaring upon the alleged illegal stipulation, and relief can be given without enforcing this part of the contract. In such a case the action, it may be said, is not based on the agreement alleged to be illegal or invalid, but on the promise created by law to repay money of the plaintiff improperly obtained. 9 Cyc., 547."
Many authorities are cited in support of this position, and among others, Morville v. Am. Trust Society, 123 Mass. 129, in which the language used is so apposite to the facts in this record that we reproduce it: "The money of the plaintiff was taken and is still held by the defendant under an agreement which, it is contended, it had no power to make, and which, if it had power to make, it has wholly failed on its part to perform. It was money of the plaintiff, now in the possession of the defendant, which in equity and good conscience it ought now to pay over, and which may be recovered in an action for money had and received. The illegality is not that which arises when the contract is in violation of public policy or of sound morals, and under which the law will give no aid to either party. The plaintiff himself is chargeable with (424) no illegal act, and the corporation is the only one at fault in exceeding its corporate powers by making the express contract. The plaintiff is not seeking to enforce that contract, but only to recover his own money and prevent the defendant from unjustly retaining the benefit of its own illegal act. He is doing nothing which must be regarded as a necessary affirmance of an illegal act."
We are, therefore, of opinion that if the contract is illegal, which is at least doubtful, that the plaintiff, not being in pari delicto with the defendant, can maintain his action, and that there was error in granting the motion to nonsuit.
Reversed.
Cited: Morgan v. Fraternal Assn., 170 N.C. 80; Davis v. R. R.,172 N.C. 211. *Page 341