**WYSONG AND MILES COMPANY,**
**Plaintiff,**

v.

**EMPLOYERS OF WAUSAU, Allstate Insurance Company, American Automobile Insurance Company, Associated Indemnity Corporation, Hartford Casualty Insurance Company, Hartford Insurance Company, Hartford Accident and Indemnity Company, North Brook Excess and Surplus Company, The Travelers Indemnity Company, Fireman's Fund Insurance Company, Insurance Services Office, and North Carolina Fire Insurance Rating Bureau, Defendants.**

No. 2:95CV00816.

United States District Court,
M.D. North Carolina,
Greensboro Division.

April 3, 1998.

John T. Weigel, Jr., Greensboro, NC, William L. Osteen, Jr., Greensboro, NC, for Plaintiff.

James R. Fox, Winston–Salem, NC, Walter E. Brock, Jr., Raleigh, NC, William K. Davis, Raleigh, NC, John Turner Williamson, Raleigh, NC, Frederick K. Sharpless, Greensboro, NC, Paul C. Lawrence, Charlotte, NC, Lindsay R. Davis, Jr., Greensboro, NC, Richard T. Rice, Winston–Salem, NC, for Defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

This matter is before the Court on a number of different motions. The first is a motion to dismiss [Doc. # 1] filed by the North Carolina Rate Bureau ("NCRB") on behalf of Defendant North Carolina Fire Insurance Rating Bureau ("NCFIRB").[1] In response to this motion, Plaintiff Wysong and Miles Company ("Wysong") filed Plaintiff's Re-

---

1. The propriety of this filing is addressed *infra* at 424–425.

sponse to Defendant Insurance Service Office's Notice of Removal and Defendant North Carolina Fire Insurance Rating Bureau's Motion to Dismiss [Doc. # 23]. Because the proper response to a notice of removal is a motion for remand and Wysong's filing requests a remand of the case to state court, this filing will be treated as a motion for remand as well as a response to the NCRB's motion to dismiss. Finally, the Court has before it motions to dismiss filed on behalf of the following Defendants: Hartford Casualty Company, Hartford Insurance Company, Hartford Insurance Company of the Southeast, and Hartford Accident and Indemnity Company (collectively, "Hartford") [Doc. # 15]; Insurance Services Office, Inc. ("ISO") [Doc. # 17]; Fireman's Fund Insurance Company, Associated Indemnity Corporation, and American Automobile Insurance Company (collectively, "Fireman's") [Doc. # 19], and; the Travelers Indemnity Company ("Travelers") [Doc. # 21]. (Hartford, Fireman's, and Travelers will be referred to collectively as the "Insurer Defendants.") For the reasons set forth below, Wysong's motion to remand is DENIED. All of the motions to dismiss named above are GRANTED.

## I. FACTS

Wysong, a North Carolina corporation, is a manufacturer of machine tools with its principal place of business in Guilford County, North Carolina. From 1965 until 1978, Wysong disposed of various industrial fluids, including 1.1 trichloroethane (TCA), in a disposal basin at its manufacturing facility designed for this purpose. In October of 1987, Wysong detected and reported a loss of TCA from an above-ground storage tank. Further investigation revealed that the groundwater near the facility had been contaminated by this release as well as by releases from the disposal basin. The North Carolina Department of Environment and Natural Resources is holding Wysong responsible for the costs of cleaning up this contamination. To date, Wysong has spent at least $1,200,000 cleaning up the contamination and ex-

pects to spend $980,000 over the next thirty years to complete the process.

From 1965 to 1987, Wysong purchased Comprehensive General Liability (CGL) insurance policies from one or more of the Insurer Defendants.[2] All of the Defendants are incorporated and have their principal places of business outside North Carolina. With the exception of the policies issued by Wausau and by Travelers, all of the policies contained a standard form exclusion clause barring recovery for damages caused by pollutants unless the release of those pollutants was "sudden and accidental." Travelers' policy allowed recovery only when the release of pollutants was neither "expected [n]or intended." The language of Wausau's pollution exclusion is currently unknown, but it is not at issue here because Wausau has not filed a motion to dismiss.

## II. NCRB'S MOTION TO DISMISS

Shortly before this matter was removed to this Court, the NCRB filed a motion to dismiss [Doc. # 1] on behalf of the NCFIRB, asserting that the NCFIRB no longer exists and that the NCRB is not a successor-in-interest to the former agency. The NCRB had learned of the suit when Wysong served an NCRB official with notice of the suit against the NCFIRB. As noted above, Wysong filed a combined Response to Defendant Insurance Service Office's Notice of Removal and Defendant North Carolina Fire Insurance Rating Bureau's Motion to Dismiss [Doc. # 23], which the Court is construing as a motion for remand. ISO filed a reply to Wysong's motion in which it also asserts that the NCFIRB does not exist. These two motions must necessarily be treated before the others, as the NCFIRB's continued presence as a defendant in the case would prevent the Court from exercising diversity jurisdiction. Because the NCFIRB no longer exists, the Court grants the motion to dismiss the NCFIRB and denies Wysong's motion for remand.

2. Information concerning which Insurer Defendant provided coverage in any given year is con-

tained in the chart attached as an appendix.

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992). In considering a motion to dismiss, all claims are construed in the light most favorable to the non-moving party and its allegations are taken as true. *Martin Marietta*, 991 F.2d at 97.

■ Because this case was removed under the Court's diversity jurisdiction, the law of the forum state applies. In North Carolina, a civil suit cannot usually proceed against a legal entity that does not exist at the time of suit. *See Rollins v. Junior Miller Roofing Co.*, 55 N.C.App. 158, 163, 284 S.E.2d 697, 701 (1981). Suits against a regulatory board or agency may be brought after the agency's abolition, but such suits must be brought within one year after the abolition of the agency. *See* N.C.G.S. § 143–270. The NCFIRB was an unincorporated association created by statute in 1945. *See* 1945 N.C. Sess. Laws 380. The legislation which created the NCFIRB was repealed in 1977, *see* 1977 N.C. Sess. Laws 828, thus abolishing the NCFIRB, *see State of N.C. ex rel. Commissioner of Ins. v. N.C. Automobile Rate Administrative Office*, 293 N.C. 365, 380, 239 S.E.2d 48, 58 (1977). The NCFIRB was therefore not an existing entity when Wysong filed this action in 1995 nor had it been within one year prior to Wysong's filing. Thus, the NCFIRB is not a proper defendant in this action.

Wysong's Response to the NCRB's motion contains two requests that are almost contradictory—first, to strike the NCRB's motion as one not filed by a real party in interest, and second, to allow Wysong time to conduct discovery to determine if the NCRB is a successor-in-interest to the NCFIRB. The Court denies both requests.

Wysong's first request runs counter to its own treatment of the NCRB since this case began. As noted above, Wysong initially served a NCRB official in lieu of someone from the NCFIRB. In the very same document which contains its request to strike the NCRB's motion, Wysong also suggests that the NCRB is a successor-in-interest to the NCFIRB and, by extension, is liable for millions of dollars in damages. Wysong's apparent intent to implicate the NCRB in this fashion gives the NCRB a real interest in this case by giving it a powerful incentive to avoid becoming a part of the case.

■ Wysong's request for time to conduct discovery regarding the NCRB is now moot. Since filing its complaint, Wysong has had over two years in which to discover any relationship between the NCFIRB and the NCRB and has produced nothing to document such a relationship. If grounds existed for treating the NCRB as the successor-in-interest to the NCFIRB for the purposes of this case, Wysong should have unearthed them by now.

In summary, the NCRB's Motion to Dismiss this case against the NCFIRB is granted because the NCFIRB did not exist when Wysong's complaint was filed. Wysong's motion for remand is denied because there is no basis for a remand.

### III. JURISDICTION AND CHOICE OF LAW

■ Given that the NCFIRB is no longer a party to this action, complete diversity exists and jurisdiction lies with this Court pursuant to 28 U.S.C. Section 1332. According to North Carolina's choice of law rules, contracts of insurance are usually interpreted in accordance with the laws of the state where the contract was made and delivered. *See Johns v. Automobile Club Ins. Co.*, 118 N.C.App. 424, 426, 455 S.E.2d 466, 468 (1995). Tort claims are governed by the law of the state in which the injuries were sustained. *See Boudreau v. Baughman*, 322 N.C. 331, 335–36, 368 S.E.2d 849, 854 (1988); *see also Lloyd v. Carnation Co.*, 61 N.C.App. 381, 388, 301 S.E.2d 414, 418 (1983) (applying same rule to claims of unfair practice in trade or business). Because all of the contracts at issue in this case were made and delivered in North Carolina and all of the alleged injuries were sustained in North Car-

olina, North Carolina law governs this dispute.

## IV. OTHER MOTIONS TO DISMISS

Wysong asserts its claims through four causes of action: (1) regulatory fraud; (2) lack of notice; (3) estoppel; and (4) unfair practice in trade or business. Each Defendant makes several different arguments as to why each cause of action should be dismissed. Some of these arguments are common to multiple Defendants and some are made only by one of the Defendants. For the purposes of economy, the Court will address only as many arguments as are necessary to dispose of each claim with respect to each Defendant. Because Wysong's claims cannot be meaningfully understood apart from the history of the relationship between CGL policies and damages caused by pollution, however, a summary of that history precedes the discussion of Wysong's claims.

## A. COMPREHENSIVE GENERAL LIABILITY POLICIES AND DAMAGES CAUSED BY POLLUTION

The application of CGL policies to damages caused by pollution first began to generate litigation over thirty years ago. Since that time, the insurance industry has developed and used at least three standards for coverage with respect to damages from pollution. The history of these developments have already been well documented by courts, *see, e.g., New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1196–98 (3d Cir.1991); *Morton Int'l, Inc. v. General Accident Ins. Co. of Am.,* 134 N.J. 1, 629 A.2d 831, 848–55 (1993), and commentators, *see, e.g.,* Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L.Rev. 610, 622–27 (1990); E. Joshua Rosenkranz, Note, *The Pollution Exclusion Through the Looking Glass,* 74 Geo. L.J. 1237, 1241–53 (1986). Only a brief recitation from the sources above is necessary here.

It has long been customary for the various companies in the insurance industry to use the same standard language in their policies. This language is often drafted and then shepherded through any necessary regulatory procedures by industry trade associations, such as ISO. Beginning in 1966, insurers switched from a standard form which had covered liability "caused by accident" to one which covered liability caused by an "occurrence." An "occurrence" was generally defined as an accident which results in bodily injury or property damage "neither expected nor intended" by the insured. Beginning in 1970, insurers began to adopt a new pollution exclusion clause that disclaimed liability unless the release of pollutants was "sudden and accidental." During the regulatory approval process for this last change, insurance industry officials made representations concerning the reason for this change and its effect on the scope of coverage that were, at best, ambiguous and, at worst, misleading.

Since the "sudden and accidental" clause became standard, state courts interpreting its effect on the scope of insurance coverage have diverged. Courts that have considered regulatory history in reaching their decisions have often found that the clause did not reduce the scope of coverage, while those that have restricted their analysis to the language of the clause have generally found that it did reduce the scope of coverage. *See* Kelly J. Sosnow, Recent Development, *Insurance Industry Misrepresentation and the Pollution–Exclusion Clause: Morton International, Inc. v. General Accident Insurance Co. of America, 629 A.2d 831 (N.J.1993),* 18 Harv. Envtl. L.Rev. 249, 251–57 (1994). The Supreme Court of North Carolina belongs in the latter group. The "sudden and accidental" clause became standard in CGL policies issued to North Carolina insureds in 1974.[3] In 1986, the Supreme Court of North Carolina ruled that this clause excludes damage "caused by the gradual release, escape, discharge, or dispersal of irritants, contaminants, or pollutants." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 697, 340 S.E.2d 374, 381 (1986). There is no

---

**3.** As mentioned above, most of the policies which Wysong purchased after 1974 contained this clause.

evidence in the opinion that the court considered the regulatory history of the clause in reaching its decision.

The most well known case using a different approach to reach a different result is *Morton*. In that case, the Supreme Court of New Jersey ruled that the "sudden and accidental" clause would not be given effect as written. *See* 629 A.2d at 848. The *Morton* court pointed out that the insurance industry's use of standard form contracts meant that the only "arms-length evaluation" of the clause occurred when the clause was submitted to and reviewed by state authorities, not when individual insureds purchased their policies. *Id.* at 852. The court then found that enforcement of the clause as written was unfair because of insureds' reliance on the "grossly misleading" statements made by insurance industry representatives during the regulatory approval of the "sudden and accidental" pollution exclusion, statements which gave the impression that the clause was not intended to affect the scope of coverage but to clarify the requirement that pollution be unintentional. *See id.* at 847, 875.

Since *Morton*, a number of courts have faced similar arguments based on claims of "regulatory estoppel" or "regulatory fraud." Most courts have rejected these claims. *See, e.g., ACL Techs., Inc. v. Northbrook Property and Cas. Ins. Co.*, 17 Cal.App.4th 1773, 22 Cal.Rptr.2d 206, 216–18 (1993) (finding use of regulatory history inconsistent with rules of insurance contract interpretation and improper because of lack of authority making individual insurers bound by earlier statements made by industry spokespeople); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 705 (Fla. 1993) (finding consideration of regulatory history "inappropriate and unnecessary" given unambiguous language of exclusion); *Anderson v. Minnesota Ins. Guar. Ass'n*, 534 N.W.2d 706, 709 (Minn.1995) (finding unreasonable as a matter of law any reliance on representations contrary to the "unambiguous meaning of the policy language"); *Goodyear Tire & Rubber Co. v. Aetna Cas. and Sur. Co.*, 1995 WL 422733, *7–10 (Ohio Ct. App. 9th Dist.1995) (finding that insureds

were not entitled to rely on representations made during regulatory approval process and that insureds could not demonstrate actual reliance on statements made to them by insurers); *Aluminum Co. of Am. and Northwest Alloys, Inc. v. Accident and Cas. Ins. Co.*, No. 92–2–28065–5, slip op. at 8–13 (Wash.Sup.Ct. Jan. 30, 1995) (finding that misrepresentations of others could not be imputed to defendant insurers, that plaintiff insureds did not rely on misrepresentations, and that state insurance department was not justified in relying on misrepresentations).

## B. WYSONG'S CLAIMS

In the present case, the Insurer Defendants have denied coverage for any damages caused by the leak of TCA at Wysong's facility on the ground that these damages fall within their policies' "sudden and accidental" exclusions.[4] Wysong, seeking a way to avoid remediation costs projected to exceed $2 million, has adopted a *Morton*-type strategy in its complaint. Wysong prays for a declaratory judgment that the "sudden and accidental" pollution exclusion clause in any of its policies purchased from the Defendant insurers is void because of the alleged misrepresentations made by the Defendants or their agents while obtaining regulatory approval for use of the clause in North Carolina. Any policies with this clause, it argues, should be read as if they contained the "neither expected nor intended" clause and, when so read, should entitle Wysong to a declaratory judgment that the damages caused by the TCA leak were covered by the policies at issue.

### 1. Regulatory Fraud

■ The first claim for relief in Wysong's complaint, regulatory fraud, is patterned on the *Morton* case. Although no North Carolina court has ever recognized an action for regulatory fraud, Wysong argues that existing North Carolina law concerning fraud by concealment supports a result like that reached in *Morton*. According to Wysong, such a result would be "entirely consistent with North Carolina's continued support of honest and fair dealing." (Pl.'s Resp. Hart-

4. Travelers, since its policies did not contain this clause, has denied liability on different grounds.

ford's Mot. Dismiss at 20.) The elements of fraud in North Carolina are:

> (1) the defendant's false representation of a past or existing fact, (2) defendant's knowledge that the representation was false when made or it was made recklessly without any knowledge of its truth and as a positive assertion, (3) defendant made the false representation with the intent it be relied on by the plaintiff, and (4) the plaintiff was injured by reasonably relying on the false representation.

*Britt v. Britt,* 320 N.C. 573, 579, 359 S.E.2d 467, 471 (1987), *overruled on other grounds; Myers & Chapman, Inc. v. Thomas G. Evans, Inc.,* 323 N.C. 559, 374 S.E.2d 385 (1988); *Jordan v. Crew,* 125 N.C.App. 712, 720, 482 S.E.2d 735, 739 (1997). An action for fraud will also lie if a defendant conceals a material fact rather than misrepresenting one. *See Ragsdale v. Kennedy,* 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

All of the Defendants argue that Wysong has not stated a claim because the facts alleged are insufficient to support a finding of reliance. The Court agrees that Wysong has failed to allege facts from which reasonable reliance could be found. Wysong's complaint does not allege that it relied on any representations made to it by the Defendants or their agents. If any reliance can be read from the language of the complaint, it was unreasonable as a matter of law.

■ Wysong's complaint contains no allegations that any of the Defendants or their agents ever made any statements to Wysong or its agents. Wysong's complaint alleges only that it purchased policies containing the "sudden and accidental" clause and that, in doing so, it relied on the fact that the clause had been approved by the North Carolina Commissioner of Insurance ("Commissioner"). Reading these allegations in the light most favorable to Wysong, the complaint supports an inference that Wysong relied on the Commissioner's approval of the clause, an act which the Commissioner had taken in reliance on misrepresentations the Defendants or their agents made while obtaining approval of the clause.

Wysong argues that this sort of secondary reliance was proper because it was entitled to "rely on the legality of the insurance transaction without inquiry into the public records relating to it." (Pl.'s Resp. ISO's Mot. Dismiss at 7.) In effect, Wysong argues that it was entitled to rely on the fact that the Commissioner approved the new clause without a corresponding rate reduction as evidence that the clause did not affect the scope of coverage. Wysong cites *Robinson v. Security Life and Annuity Company,* 163 N.C. 415, 79 S.E. 681 (1913), in support of this proposition. Presumably, Wysong relies on the following language from *Robinson:* "the insured has a right to assume that the insurer has complied with all the requirements of the law." *Id.* at 421, 422, 79 S.E. 681.

*Robinson,* however, is inapposite. The context in which *Robinson* was decided was quite different from the present case. There, the court used an estoppel-type theory in refusing to allow an insurance company that had accepted payments from the plaintiff for ten years to assert that an insurance contract was illegal when made and could not lawfully be performed according to its terms. 163 N.C. at 423–24, 79 S.E. 681. The court used the proposition quoted above to help explain why the insurer could not escape the terms of a contract it had begun to perform and receive benefits from. *Robinson* did not address the issue of whether an insured could maintain an action for fraud without actually proving reliance on statements made by an insurer to a regulatory body, and it certainly did not create a rule of law on this issue. *Robinson* does not make reasonable any reliance by Wysong on the fact that the Commissioner had approved the "sudden and accidental" clause.

The Court knows of no other North Carolina cases that address the reasonableness of reliance on representations made to a regulatory official. The *Morton* court, whose opinion serves as the "basis" for Wysong's claim, (*see* Pl.'s Resp. Hartford's Mot. Dismiss at 8), did not look at this issue, either. Instead, it explained its ruling as one of contract interpretation. *See* 629 A.2d at 875–76. Other courts that have analyzed the specific question of the reasonableness of reliance on representations to a regulatory official have found that any such reliance was

unreasonable as a matter of law. *See Cessna Aircraft Co. v. Hartford Accident & Indem. Co.,* 900 F.Supp. 1489, 1510 (D.Kan.1995) (applying Kansas law); *Goodyear Tire & Rubber Co. v. Aetna Cas. and Sur. Co.,* 1995 WL 422733, *8 (Ohio Ct.App. 9 Dist.1995) (applying Ohio law). Both the *Cessna* and the *Goodyear* courts referred to Section 536 of the Restatement of Torts in their rulings. This section provides:

> If a statute requires information to be furnished, filed, recorded or published for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability to the person for pecuniary loss suffered through their justifiable reliance upon the misrepresentation in a transaction of the kind in which the statute is intended to protect them.

Restatement (Second) of Torts, § 536 (1977).

There is no reason to think that North Carolina courts would not adopt Section 536 of the Restatement as it pertains to fraudulent misrepresentations. The Supreme Court of North Carolina has already adopted the Restatement's position concerning the very similar tort of negligent misrepresentation. *See Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 214, 367 S.E.2d 609, 617 (1988). The Court therefore concludes that Section 536 of the Restatement of Torts is applicable here.

■ The next question is how Section 536 applies to this case. The comments concerning the section suggest an answer. Comment f explains:

> A statute that requires information to be given to . . . a state insurance commissioner as a prerequisite to permitting a[n] . . . insurance company to be incorporated or to do business in the state may be regarded as intended only to control the action of the department in permitting the incorporation or granting the permit. A court may so interpret the statute although it is a matter of common knowledge that the favorable action will not be taken unless the report states facts which, if stated directly to the public, would be misrepresentations material in business transactions with the company . . . .

On the other hand, when its terms or language call for interpretation, the statute may be construed as intended to give protection to those who rely upon the filed information in their dealings.

That comment contrasts with Comment g:

> The rule stated in this Section is not necessary to the liability of one who, having made a misrepresentation in a report that is required by a statute, adopts it as a true statement by showing it to another or by calling his attention to it. In this case it is immaterial that the report is one that the statute requires to be made solely to influence the official action of the governmental officers. Thus, when an insurance company before writing insurance is required to obtain a license that is granted only upon the presentation of a satisfactory report of its financial standing, and an officer of the company, in order to induce another to take out a policy, shows him the report knowing it to contain false statements, the officer is subject to liability to the insured for the loss resulting from reliance upon the false statements, although the report was required only for the guidance of the licensing authority.

The statute at issue here, N.C.G.S. Section 58–40–30, requires that insurers file rating plans with the Commissioner for approval before they can sell insurance. The statute is analogous to the reporting statutes described in Comment f in that it is intended to control the actions of the Commissioner in determining whether insurers comply with the other provisions of that Article. The *Goodyear* court reached the same conclusion concerning Ohio's laws governing the filing and regulation of insurance rates. 1995 WL at *8. It determined that the intent of the Ohio legislature in requiring insurers to file rating plans was to enable the state superintendent of insurance to determine that the rates were not "excessive, inadequate, or unfairly discriminatory" as prohibited by the law. *Id.* "The purpose is not to enable the public to make decisions concerning the meaning of, or extent of coverage available under, any particular provision." *Id.* The Ohio regulatory scheme is very similar to the

scheme in place in North Carolina. Although Article 40's initial statement of purpose to "promote the general welfare by regulating rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory," see N.C.G.S. § 58–40–1(1), might be read to suggest that North Carolina's filing requirements are designed to protect those who rely on the filed information, a more complete reading of the Article reveals that the specific purpose of requiring filings is to allow the Commissioner to determine if insurer's rates comply with the article, see id. §§ 58–40–20 (defining rates that are inadequate or unfairly discriminatory), 58–40–25 (describing criteria for determining if rates are excessive, inadequate or unfairly discriminatory), 58–40–30 (requiring insurers and rating organizations to file rates and changes with the Commissioner before they become effective), 58–40–45 (outlining process by which the Commissioner disapproves rates). Wysong is not claiming any representations by the Defendants that would support an action as described in Comment g. Nor does Wysong claim that it relied on misrepresentations other than those made to the Commissioner so that he could determine whether the Defendants' proposed rates conformed with the law. Accordingly, any reliance by Wysong on representations made by the Defendants to the Commissioner was unreasonable as a matter of law.

Furthermore, Wysong's own complaint reveals that Wysong had no knowledge of any of the alleged misrepresentations before 1995, nine years after the purchase of the most recent insurance policy at issue. (Compl. ¶ 48.) Therefore, even if Wysong could have relied on representations made to the Commissioner, its complaint effectively admits that it did not. Wysong does not allege that it asked the Commissioner about the effect of the "sudden and accidental" clause. It merely argues that, had it made an inquiry about the clause to the Commissioner, the inquiry "would have resulted in a restatement of [the Defendants'] representation to the Insurance Commissioner." (Pl.'s Resp. Hartford's Mot. Dismiss at 18.) Because such an inquiry was not made, Wysong's speculation about how the Commissioner might have answered is irrelevant. The Court finds that Wysong could not have relied on representations about which it did not know when it purchased the insurance policies at issue.

▮ Alternatively, Wysong's complaint also fails to demonstrate that any reliance on representations made by the Defendants would have been reasonable. Insureds have a duty to read their insurance contracts. See State Farm Mut. Auto. Ins. Co. v. Atlantic Indem. Co., 122 N.C.App. 67, 71, 468 S.E.2d 570, 572 (1996). As Wysong admits, the Supreme Court of North Carolina has ruled that the "sudden and accidental" clause is not ambiguous, see Waste Mgmt., 315 N.C. at 693–95, 340 S.E.2d at 378–79, and does not cover the gradual release of pollutants, see id. at 697, 340 S.E.2d at 381. (See Pl.'s Resp. ISO's Mot. Dismiss at 10–11.) Wysong's reliance argument is very similar to one rejected by the Supreme Court of Minnesota in Anderson v. Minnesota Insurance Guaranty Association, 534 N.W.2d 706 (Minn.1995). That court had previously ruled that the "sudden and accidental" clause was not ambiguous. See id. at 709. In Anderson, the court held that reliance on any explanations contrary to the unambiguous language of the clause was unreasonable as a matter of law. Id.[5] The same is true in this case. Any reliance by Wysong on representations made by the Defendants would have been contrary to the unambiguous language of the "sudden and accidental" clause and therefore would have been unreasonable as a matter of law.

In summary, Wysong's complaint does not contain sufficient allegations that it relied on representations made by the Defendants to

---

5. Courts in some of the states that have examined the "sudden and accidental" clause have found that it is ambiguous. See, e.g., Hecla Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083, 1091–92 (Colo.1991); Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 380 S.E.2d 686, 688 (1989); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1218 (1992); Queen City Farms, Inc. v. Central Nat'l Ins. Co., 126 Wash.2d 50, 882 P.2d 703, 720–21 (1994); Just v. Land Reclamation, Ltd., 155 Wis.2d 737, 456 N.W.2d 570, 573 (1990). These holdings, however, obviously did not create law in North Carolina. Waste Management did, and it is that law which this Court must follow in a diversity case.

survive the Defendants' motions to dismiss. Furthermore, any actions that Wysong arguably could have taken in reliance on representations contrary to the language of the policies would have been unreasonable as a matter of law.

### 2. Lack of Notice

Wysong's second cause of action, lack of notice, is pled only against the Insurer Defendants. Wysong argues that these Defendants are bound by the "unintended and unexpected" clause used in prior policies because they failed to notify Wysong of changes in coverage effected by the "sudden and accidental" clause.

### i. Hartford and Fireman's

■ Hartford and Fireman's argue that they had no duty to notify Wysong of any changes in coverage because the first policies they issued to Wysong which contained the "sudden and accidental" clause were not renewals of existing policies but altogether new policies. The Court agrees that Hartford and Fireman's had no duty to notify Wysong concerning the "sudden and accidental" clause.

■ Case law provides no support for Wysong's claim that Hartford and Fireman's had a duty to notify Wysong concerning the policies they issued to it. Insureds are entitled to assume that the terms of a renewal insurance policy are the same as the terms of their original policy unless they have notice to the contrary. *See North River Ins. Co. v. Young,* 117 N.C.App. 663, 667, 453 S.E.2d 205, 208 (1995); *Gaston–Lincoln Transit, Inc. v. Maryland Cas. Co.,* 20 N.C.App. 215, 223, 201 S.E.2d 216, 221 (1973), *aff'd,* 285 N.C. 541, 206 S.E.2d 155 (1974). Wysong argues that it was entitled to make the same assumption based on the facts of this case as well, (*see, e.g.,* Pl.'s Resp. Hartford's Mot. Dismiss at 23.), but the cases do not support Wysong's argument. *North River* specifically points out that new insurance contracts and insurance policy renewals are treated differently. 117 N.C.App. at 667, 453 S.E.2d at 208 ("The threshold question in this case is the determination of whether the policy in effect at the time of the accident was a new

contract or a renewal of the original policy."). In the case on which *North River* primarily relies, *Setzer v. Old Republic Life Ins. Co.,* 257 N.C. 396, 126 S.E.2d 135 (1962), the Supreme Court of North Carolina made clear its rationale for treating these differently:

> It is a matter of common knowledge that insurance companies from time to time change the terms of their policies. One may not assume that a new insurance contract of any kind will conform to the terms of a prior policy of the same type.

257 N.C. at 403, 126 S.E.2d at 140.

In this case, Wysong has not alleged that the contracts with Hartford and Fireman's in which the "sudden and accidental" clause appeared for the first time were renewals of existing policies. Indeed, Wysong's complaint shows that the first policy it purchased from each of these Defendants contained the "sudden and accidental" clause. Wysong could not rightfully assume that these new insurance contracts conformed to the terms of policies of the same type which they had previously held. Hartford and Fireman's had no duty to warn Wysong of differences between such policies. Any renewals of policies purchased from Hartford or Fireman's involved no change in coverage, again absolving the Defendants of any duty to warn. Wysong's lack of notice claim cannot stand against Hartford or Fireman's.

### ii. Travelers

Wysong's claim for lack of notice does not apply to Travelers. Travelers never issued Wysong a policy containing the "sudden and accidental" clause, and it cannot be liable for failing to notify Wysong of a change that did not occur.

### 3. Estoppel

■ Wysong's third claim for relief asks the Court to apply the doctrine of estoppel. Wysong argues that the Insurer Defendants should be estopped from denying coverage under the "sudden and accidental" clause for damages caused by leaked TCA. In determining whether estoppel applies in a given situation, North Carolina courts examine the conduct of both parties involved. *See*

*Gaston–Lincoln Transit, Inc. v. Maryland Cas. Co.,* 285 N.C. 541, 549, 206 S.E.2d 155, 160 (1974). The elements that must be proved as to the party against whom an estoppel is claimed are:

(1) conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts.

*Id.* The elements that must be proved by the party claiming an estoppel are:

(1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Id.*

### i. Hartford and Fireman's

■ Read liberally, Wysong's complaint satisfies the elements that must be proved as to Hartford and Fireman's. But the complaint is defective as to the elements Wysong must prove with respect to itself. The discussion of reliance concerning Wysong's regulatory fraud claim is equally applicable here. Wysong has alleged no facts that support reliance in the context of its estoppel claim.

■ Even if Wysong could prove all of the elements of an estoppel claim, this is not a case in which estoppel could apply. In North Carolina, insureds cannot use the doctrine of estoppel to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded from its terms. *See Hunter v. Jefferson Standard Life Ins. Co.,* 241 N.C. 593, 595, 86 S.E.2d 78, 80 (1955); *Pearce v. American Defender Life Ins. Co.,* 316 N.C. 461, 466, 343 S.E.2d 174, 177 (1986). This rule prevents courts from rewriting insurance policies and thereby obligating insur-ance companies to pay for losses for which they did not charge a premium. *See Pearce,* 316 N.C. at 466, 343 S.E.2d at 177.

North Carolina courts have applied this rule in cases where insurance companies acted in ways that were arguably inconsistent with the express provisions of the policies they had issued. In *Hunter,* the court refused to apply estoppel to extend disability coverage expressly excluded by the plaintiff's policy even though the insurer had continued to accept payments for disability coverage after the termination date for such coverage specified in the policy. 241 N.C. at 597, 86 S.E.2d at 81. In *Pearce,* the insured sought and received assurances from the insurer that his life insurance policy, including accidental death benefits, would continue to provide coverage even though he had become an Air Force pilot since purchasing the policy. 316 N.C. at 463–64, 343 S.E.2d at 176. After the insured was killed while piloting a plane, the court ruled that an insurer was not estopped from relying on its accidental death policy rider's express exclusion of injuries resulting from "flight in ... any species of aircraft if (i) you are a pilot ... of such aircraft while in flight ...." *Id.* at 463, 466, 343 S.E.2d at 176, 178.

The rule preventing the use of estoppel to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded from its terms applies to this case as well. Wysong's estoppel argument attempts to bring within the coverage of the "sudden and accidental" clause damages that occurred gradually. *Waste Management,* however, determined that such damages are not covered by the "sudden and accidental" clause. 315 N.C. at 697, 340 S.E.2d at 381. Assuming that Wysong could establish all of the elements of an estoppel claim, this Court should not rewrite Wysong's policies to extend coverage to risks that the policies did not cover by their terms.

### ii. Travelers

Wysong's claim for estoppel does not work as applied to Travelers. Travelers never issued Wysong a policy containing the "sudden and accidental" clause, so Travelers cannot

be estopped from attributing any meaning to this clause.

#### 4. Unfair Practice in Trade or Business

██ Wysong's fourth and final cause of action alleges that the Defendants' conduct during the approval process for the "sudden and accidental" clause constitutes a violation of N.C.G.S. § 75–1.1, which civilly punishes unfair or deceptive acts or practices in trade or business. A party claiming a violation of this statute must prove: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C.App. 1, 9, 472 S.E.2d 358, 362 (1996) (citations omitted). The third element of a claim under this statute "is similar to the detrimental reliance requirement under a fraud claim." *Pearce*, 316 N.C. at 471, 343 S.E.2d at 180 (1986).

##### i. Hartford and Fireman's

Hartford and Fireman's argue, as they do with respect to Wysong's other claims, that the allegations in Wysong's complaint do not indicate that it detrimentally relied on any of the conduct it has alleged, or that the alleged conduct proximately caused injury to Wysong. As indicated above, Wysong's complaint cannot support a finding that it detrimentally relied on any representations or acts by Hartford and Fireman's.

##### ii. ISO

██ ISO raises a statute of limitations defense to this claim. The applicable limitation period for this claim is four years. *See* N.C.G.S. § 75–16.2. A cause of action under this statute based on an alleged fraud accrues, like a common law fraud cause of action, when the unfair or deceptive act is discovered or should have been discovered in the exercise of reasonable diligence. *See Nash v. Motorola Communications and Elecs., Inc.*, 96 N.C.App. 329, 331, 385 S.E.2d 537, 538 (1989), *aff'd*, 328 N.C. 267, 400 S.E.2d 36 (1991). Whether a plaintiff exercised due diligence in discovering fraud is usually a question of fact, *see Feibus & Co., Inc. v. Godley Construction Co.*, 301 N.C. 294, 304–05, 271 S.E.2d 385, 392 (1980), but this question may be determined as a matter of law where the plaintiff clearly had both capacity and opportunity to discover the fraud. *See Grubb Properties, Inc. v. Simms Investment Co.*, 101 N.C.App. 498, 501, 400 S.E.2d 85, 88 (1991); *Hiatt v. Burlington Indus., Inc.*, 55 N.C.App. 523, 526, 286 S.E.2d 566, 568 (1982). In *Grubb*, for example, the court ruled that a plaintiff, during the process of preparing and filing a legal document describing property it had recently purchased, should have discovered that the deed for the property did not include an adjacent tract of land. 101 N.C.App. at 501–02, 400 S.E.2d at 88. In *Hiatt*, the plaintiff claimed that he was defrauded of his rights to a valuable invention. 55 N.C.App. at 526, 286 S.E.2d at 567. The court found that, even if the plaintiff did not understand the document in which he assigned to his employer his rights to the patent on his invention, his cause of action accrued when he received a patent document listing him as "assignor of his first patent." *Id.* at 529, 286 S.E.2d at 570.

The policies with language currently at issue in this case were purchased by Wysong beginning in 1974. ISO argues that Wysong's cause of action accrued and the statute of limitations began to run at the time the alleged misrepresentations were made. (*See* ISO's Mot. Dismiss at 19–20.) Wysong contends that its cause of action did not accrue until a memorandum that it claims reveals the nature and extent of ISO's alleged misrepresentations concerning the "sudden and accidental" clause "became a part of the public domain . . . upon the filing of a letter brief and appendix in the New Jersey [Supreme Court] on October 29, 1993." (Pl.'s Resp. ISO's Mot. Dismiss at 18.)

It is not necessary to address the argument that Wysong's action accrued when the alleged misrepresentations were made. Even assuming that ISO is incorrect, the Supreme Court of North Carolina had ruled in February of 1986, in the *Waste Management* case, on the meaning of the "sudden and accidental" exclusion clause. *See supra* at 426–427. Wysong alleges in its complaint

that it "believed that it was covered for loss resulting from contamination which was neither expected nor intended." (Comp.¶ 56.) Although Wysong does not assert the basis for this belief, it certainly was chargeable with notice of the Supreme Court of North Carolina's ruling that the phrase "sudden and accidental" was not ambiguous and was not synonymous with the phrase "neither expected nor intended." Being on notice that the meaning of "sudden and accidental" was different from its previous understanding, Wysong had a duty to investigate whether it had been misled about its coverage when it learned about the TCA leak at its premises in 1987. Its receipt of this information was analogous to both the plaintiff's filing of the legal document in *Grubb* and the plaintiff's receipt of the patent document in *Hiatt*. Wysong's complaint offers no suggestion that it did not have the capacity or the opportunity to discover the Guiney memorandum or other evidence of fraudulent conduct before 1993. The fact that this memorandum was not "part of the public domain" until it was filed during proceedings in the *Morton* case does not demonstrate a lack of opportunity. The plaintiffs in *Morton* were able to obtain the memorandum, presumably through the normal channels of discovery. The Court finds that Wysong's claim for unfair trade or business practices accrued, at the latest, when it discovered the TCA leak in 1987. Any facts that would have supported this claim should have been discovered, in the exercise of due diligence, within four years of that time. Wysong's claim is therefore time-barred.

### iii. Travelers

The cause of action for unfair trade practices applies no more to Travelers than do the two preceding ones. Travelers' exclusion clause reads exactly the way that Wysong argues all of the exclusion clauses should be read. Even if, as Wysong argues, Travelers is liable on this cause of action for misrepresentations made by the NCFIRB concerning the meaning of the "sudden and accidental" clause, Travelers did not sell any policies to Wysong containing that clause. Travelers could not have acted unfairly or deceptively towards Wysong within the meaning of this statute when its policies read exactly the way Wysong argues that they should.

## V. CONCLUSION

Wysong's complaint raises questions about exactly how the "sudden and accidental" pollution exclusion clause came to be approved for use in North Carolina, but it does not contain allegations sufficient to support any of the causes of action it pleads.

Therefore, the following motions are GRANTED: (1) NCRB's Motion to Dismiss [Doc. # 1]; (2) the Hartford Defendants' Motion to Dismiss [Doc. # 15]; ISO's Motion to Dismiss [Doc. # 17]; (3) the Fireman's Defendants' Motion to Dismiss [Doc. # 19]; and (4) Travelers' Motion to Dismiss [Doc. # 21].

The Motion for Remand contained in Plaintiff's Response to Defendant Insurance Service Office's Notice of Removal and Defendant North Carolina Fire Insurance Rating Bureau's Motion to Dismiss [Doc. # 23] is DENIED.

The Court reserves ruling on Wysong's request for a declaratory judgment. The issue of whether the policy Wysong purchased from Travelers provides coverage for damages caused by the TCA leak should be further briefed by these two parties.

### APPENDIX

| EFFECTIVE DATES OF POLICIES | INSURER DEFENDANT |
|---|---|
| 1964—07/15/74 | Employers Insurance of Wausau |
| 07/01/74—07/01/75 | Allstate Insurance Company |
| 08/15/75—08/15/78 | American Automobile Insurance Company |
| 08/15/75—08/15/78 | Associated Indemnity Corporation |

| | |
|---|---|
| 08/15/76—08/15/81 | Hartford Casualty Insurance Company |
| 10/01/80—1981 | Hartford Accident and Indemnity Company |
| 08/15/81—08/15/82 | Hartford Insurance Company |
| 10/01/81—10/01/82 | North Brook Excess and Surplus Company |
| 10/01/81—10/01/82 | Travelers Indemnity Company |
| 10/01/82—10/01/83 | Hartford Insurance Company |
| 10/01/83—10/01/84 | Hartford Casualty Insurance Company |
| 10/01/84—10/01/88 | Fireman's Fund Insurance Company |