**WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff,**

v.

**Carl W. JOHNSON;   Carl W. Johnson Family Trust, d/b/a The Cotton Mill Square;   Landin Ltd;   and Joseph Baldwin, Defendants.**

No. 98CV00715.

United States District Court, M.D. North Carolina.

June 27, 2002.

Derek J. Allen, James Conrad Adams, II, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, C. Michael Johnson, Henry M. Quillian, III, Brad S. Kalter, Fellows Johnson & La Briola, LLP, Atlanta, GA, for Plaintiff.

James H. Kelly, Jr., Kilpatrick Stockton, L.L.P., H. Brent Helms, Robinson & Lawing, Winston–Salem, NC, William L. Hill, Moss Mason & Hill, Greensboro, NC, for Defendants.

## MEMORANDUM OPINION

BEATY, District Judge.

This case comes before the Court upon the United States Court of Appeals for the Fourth Circuit's February 28, 2001 remand of the Court's January 6, 2000 Memorandum Opinion and Order and Judgment granting partial summary judgment to Plaintiff Westchester Fire Insurance Company ("Westchester" or "Plaintiff"). The Fourth Circuit remanded the case in order for the Court to re-evaluate its January 6, 2000 decision granting partial summary judgment to Plaintiff as to Defendants Carl W. Johnson ("Johnson"), Carl W. Johnson Family Trust, d/b/a The Cotton Mill Square, and Landin Limited's (together, "Defendants")[1] counterclaim under the

---

1. Defendant Joseph Baldwin did not join with    the other Defendants in the assertion of the

Unfair and Deceptive Trade Practices Act (UDTPA), N.C.Gen.Stat. § 75–1.1, in light of the North Carolina Supreme Court's decision in *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676 (2000). For the following reasons, the Court now holds that Plaintiff's Motion for Summary Judgment as to Defendants' unfair and deceptive trade practices counterclaim is GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendants' counterclaim arises from an insurance policy ("the Policy") issued by Westchester insuring Cotton Mill Square ("Cotton Mill"), a shopping center in Greensboro, North Carolina. Defendants are the named insureds listed on the Cotton Mill policy. The policy provides $300,000.00 coverage for "loss of business income (rents)" and $5,930,000.00 blanket coverage for losses to the Cotton Mill building itself and to certain covered items of business personal property. As the facts giving rise to this lawsuit are explained in greater detail in its January 6, 2000 Memorandum Opinion, the Court will at this time only briefly summarize the relevant background necessary for the counterclaim currently before the Court.

On February 3, 1996, an ice storm caused Cotton Mill to lose power. Defendants hired an electrician, Joseph Baldwin, to restore power to the building but, in the course of the electrician's work, a fire started that destroyed a circuit panel. As a result of the fire, Cotton Mill was without heat, electricity, and lights for six days until generators were procured that provided temporary power to Cotton Mill. This limited temporary generator power was insufficient to heat the entire shopping center, and Cotton Mill remained closed to the public.

After the fire, Johnson notified Plaintiff of the incident and began investigating how to repair the damaged circuit panel and restore power to Cotton Mill.[2] On February 16, 1996, Johnson received a ninety-day temporary permit from the City's Department of Inspection approving the use of a fuse link system as a temporary power supply. However, the fuse link system was designed and approved only to provide a limited amount of power to Cotton Mill. Consequently, Cotton Mill remained closed to the public while Defendants and Plaintiff investigated methods to restore permanent power to the mall.

After considering several options, Defendants and Plaintiff ultimately agreed on a proposal, submitted by Bowman Electric ("Bowman") on March 27, 1996, to repair the circuit panel by replacing the damaged switch gear system with a rebuilt switch gear system. The repairs were estimated to take a minimum of one month. However, because many Cotton Mill tenants had vacated the property, Defendant Johnson elected in early April of 1996 to neither repair nor reopen Cotton Mill. (Dep.Ex. 41, April 9, 1996 Letter from Carl Johnson to Artistic Impressions.)

By the time Defendant Johnson made the decision to not reopen Cotton Mill, Johnson estimates that he had spent more than $118,000 on repairs and necessary security related to the fire. By June of 1996, Defendants' adjustor submitted partial sworn proofs of loss for $100,000 of repair costs, and Plaintiff reimbursed Defendants for $100,000, pursuant to the Policy.[3] In addition to these claims under the property damage policy, Defendants indicated to Plaintiff that they also intended to

§ 75–1.1 counterclaim.

2. At first, Johnson dealt directly with Plaintiff's adjustor, Claude Chandler ("Chandler"), but in mid-February of 1996 Johnson hired his own adjustor to represent him through the claim settlement process.

3. This total is comprised of a $50,000.00 advance paid by Westchester to Defendants on February 16, 1996, and a second payment to

file a claim for lost business income. The parties began discussing the claim under the business income policy through their adjustors in December of 1996, at which time Defendants' adjustor informed Plaintiff that he would file a sworn statement in proof of loss for the business income claim after Defendants had collected the needed financial documents. (Foster Dep. at 114.) In March of 1997, Defendants, through their attorney, wrote Plaintiff informing it that they were making a demand under the business income policy for $300,000, which was the business income policy's limit.

The parties continued discussions and exchanged documents regarding Defendants' claims. These communications included Plaintiff's examination of Defendant Johnson under oath on November 7, 1997, and Johnson's March 16, 1998 sworn statement in proof of loss, submitted to Plaintiff in April of 1998,[4] that asserted additional losses under the Policy's business income and property coverage provisions. As the March 16, 1998 sworn statement in proof of loss included claims that were markedly higher than earlier estimates, Plaintiff asked Defendants for permission to conduct an additional examination of Defendant Johnson under oath before issuing its determination of loss as to the business income policy. Defendants agreed to the examination under oath and also agreed to give Plaintiff an extension of fifteen days after the examination under oath to pro-

vide Defendants with its interpretation of coverage. Despite this agreement, the parties were unable to arrange a mutually acceptable time for the second examination under oath. On July 24, 1998, Defendants' counsel indicated to Plaintiff that Defendants were no longer willing to grant the extension and asked for Plaintiff's response to Defendants' claim for business income coverage within fifteen days. In lieu of a response, Plaintiff filed the Complaint in this action on August 14, 1998, alleging one count of intentional misrepresentation and one count of reimbursement for moneys paid to Defendants. In the alternative, Plaintiff's Complaint requested a declaratory judgment establishing its obligations under the Policy. Defendants counterclaimed by asserting that Plaintiff violated UDTPA and breached its contract in bad faith.

On January 6, 2000, the Court issued a Memorandum Opinion [Document # 100] and Order and Judgment [Document # 101] as to Plaintiff's Motion for Summary Judgment or in the alternative for Partial Summary Judgment (hereinafter "Plaintiff's Motion for Partial Summary Judgment") [Document # 72] and Defendants' Motion for Partial Summary Judgment [Document # 75]. In the portion of its decision relevant to the current issue, the Court granted Plaintiff's Motion for Partial Summary Judgment as to Defendants' counterclaim that Plaintiff violated UDTPA.[5] The Court's discussion on this

---

Defendants of $50,000.00 made on June 25, 1996.

**4.** The correspondence between Plaintiff and Defendants suggests that Plaintiff received the March 16, 1998 sworn statement in proof of loss by April 7, 1998. (Pl.'s Reply Brief Addressing Issues Remanded by the Fourth Circuit Court of Appeals Ex. 3, Attach. S.) Defendants then supplemented their March 16, 1998 sworn statement in proof of loss with additional documentation and submitted

these additional documents on April 27, 1998. *Id.*, Ex. 3, Attach. U.

**5.** In addition to granting partial summary judgment to Plaintiff on Defendants' counterclaim of unfair and deceptive trade practices, the Court's January 6, 2000 Memorandum Opinion and Order and Judgment also granted partial summary judgment to Plaintiff as to Defendants' counterclaim of bad faith breach of contract and as to Plaintiff's requests for a declaratory judgment establishing its obligations under the Policy for business income

point considered the two alternative methods available under the existing law at the time through which Defendants could have demonstrated their counterclaim: either by establishing a violation of UDTPA itself, or by establishing that Plaintiff violated North Carolina's insurance law that regulates claim settlement practices, N.C.Gen.Stat. § 58–63–15(11).[6] *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 470, 343 S.E.2d 174, 179 (1986). In discussing the latter method, the Court relied in part on a North Carolina Court of Appeals case, *Gray v. N.C. Ins. Underwriting Ass'n* (hereinafter "*Gray I*"), 132 N.C.App. 63, 510 S.E.2d 396 (1999), that held that a § 75–1.1 claim based on a violation of § 58–63–15(11) required a demonstration that the insurance company engaged in the prohibited conduct "with such frequency as to indicate a general business practice." *Gray I*, 132 N.C.App. at 68, 510 S.E.2d at 400 (quoting N.C.Gen. Stat. § 58–63–15(11)). As Defendants had not proffered any evidence that Plaintiff's conduct was part of a general business practice, the Court concluded that Defendants could not demonstrate the element of frequency and therefore had not presented proof of any § 58–63–15(11) violation that could serve as the basis for a § 75–1.1 violation. Proceeding then to review Defendants' other arguments supporting their UDTPA counterclaim, the Court ultimately found that Defendants' counterclaim asserting a § 75–1.1 violation could not survive summary judgment.

Shortly after the Court issued its January 6, 2000 Order and Judgment and while Defendants were appealing the Court's decision on other grounds, the North Carolina Supreme Court reversed the North Carolina Court of Appeals's *Gray I* decision in *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676 (2000) (hereinafter "*Gray II*"). In *Gray II*, the North Carolina Supreme Court determined that the unfair claim settlement practice described in one lettered subsection of § 58–63–15(11), that is, § 58–63–15(11)(f), violates § 75–1.1 even without any additional demonstration of frequency. Defendants thereafter argued to the Fourth Circuit Court of Appeals that they could now survive summary judgment on their § 75–1.1 counterclaim based on the new standard presented in *Gray II*. More specifically, Defendants asserted that they could demonstrate that Plaintiff performed the conduct prohibited under § 58–63–15(11)(a), (f), (*l*), and (m), and that, under *Gray II*, such a demonstration would preserve their § 75–1.1 claim for trial.

The Fourth Circuit, recognizing *Gray II* as an intervening change in the law, remanded the instant case to this Court with the instructions to review the Court's ruling on Defendants' § 75–1.1 counterclaim in light of the *Gray II* decision. The parties have submitted additional briefs asserting their arguments as to the remanded issues, and the Court is now ready to determine whether Defendants have sufficiently demonstrated, under the summary judgment standard, that Plaintiff committed a § 75–1.1 violation based on behavior proscribed by § 58–63–15(11)(a), (f), (*l*), and/or (m).

## II. DISCUSSION

As discussed above, the Court's review of the instant case is limited to the issues

---

and property damage. Additionally, the Court also granted partial summary judgment for Defendants on Plaintiff's claim that Defendants made a material misrepresentation to Plaintiff that voided the insurance coverage.

6. At this point in its Memorandum Opinion, the Court is referring to the legal questions at issue only as necessary to fully present the instant case's procedural history. A more thorough discussion of UDTPA and N.C.Gen. Stat. § 58–63–15(11) is found in Part II.B of this Memorandum Opinion.

remanded by the Fourth Circuit and consequently is quite narrow in scope. More specifically, the Fourth Circuit instructed the Court to consider whether Defendants can adequately support their UDTPA violation by demonstrating that Plaintiff did not attempt in good faith to effectuate a prompt and equitable settlement, pursuant to § 58–63–15(11)(f) and *Gray II.* The Fourth Circuit also directed the Court to consider Defendants' arguments that Plaintiff engaged in conduct proscribed by subsections (a), (*l*), and (m) of § 58–63–15(11). As to § 58–63–15(11)(a), (*l*), and (m), the Fourth Circuit recognized that prior to *Gray II*, a § 75–1.1 violation based on § 58–63–15(11) required that the plaintiff demonstrate that the behavior occurred with the frequency to indicate a general business practice and that *Gray II* only removed this requirement with respect to § 58–63–15(11)(f). The Fourth Circuit therefore also instructed the Court to determine whether the *Gray II* court's reasoning in support of its holding that conduct proscribed by § 58–63–15(11)(f) violates UDTPA without an additional showing of a general business practice is also applicable to § 58–63–15(11)(a), (*l*), and (m).

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only grant a motion for summary judgment for a moving party when "the entire record shows a

right to judgment with such clarity as to leave no room for controversy" and the record clearly demonstrates that the non-moving party " 'cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.,* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Nevertheless, the non-moving party cannot rely solely on unsupported assertions to demonstrate that a genuine issue of material fact exists. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 212. Judges are not " 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Id.* at 251, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Schuylkill & Dauphin Improvement & R.R. Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)).

### B. UDTPA and *Gray II*

Under UDTPA, it is illegal for a company to engage in "unfair or deceptive acts or practices in or affecting commerce." N.C.Gen.Stat. § 75–1.1. To establish a claim of unfair or deceptive trade practices, a plaintiff must demonstrate (1) an unfair or deceptive act or practice or unfair method of competition, (2) in or affecting commerce, which (3) proximately caused actual injury to the plaintiff. *Spartan Leasing v. Pollard,* 101 N.C.App. 450,

460, 400 S.E.2d 476, 482 (1991). A second statute, North Carolina Gen.Stat. § 58–63–15, defines unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. Within this section, the North Carolina legislature listed, in § 58–63–15(11), fourteen different practices that it deemed to be unfair claim settlement practices when "perform[ed] with such frequency *as to indicate a general business practice.*" N.C.Gen.Stat. § 58–63–15(11)(a–n) (emphasis added).

Before the North Carolina Supreme Court's decision in *Gray II*, it was already established law in North Carolina that a violation of § 58–63–15 "constitutes an unfair and deceptive trade practice in violation of N.C.G.S. § 75–1.1 as a matter of law." *Pearce,* 316 N.C. at 470, 343 S.E.2d at 179. Accordingly, the North Carolina courts, prior to *Gray II,* allowed a plaintiff to use § 58–63–15(11) to demonstrate a § 75–1.1 violation, but only if the plaintiff could satisfy § 58–63–15(11)'s requirement that the insurance company engaged in the prohibited conduct with the frequency of a general business practice. *See, e.g., Wake County Hosp. Sys., Inc. v. Safety Nat'l Casualty Corp.,* 127 N.C.App. 33, 43, 487 S.E.2d 789, 795 (1997); *Beasley v. Nat'l Savings Life Ins. Co.,* 75 N.C.App. 104, 109, 330 S.E.2d 207, 209–10 (1985), *disc. review improv. allowed,* 316 N.C. 372, 341 S.E.2d 338 (1986). Indeed, it was on this basis that the North Carolina Court of Appeals in *Gray I* ruled that the

plaintiffs could not recover on their § 75–1.1 claim based on § 58–63–15(11)(f), which classifies "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" as an unfair claim settlement practice. N.C.Gen.Stat. § 58–63–15(11); *Gray I,* 132 N.C.App. at 70, 510 S.E.2d at 401. After considering the facts of the case,[7] the North Carolina Court of Appeals ruled that the Gray I plaintiffs had not established a § 75–1.1 violation because there was no evidence that the defendant's behavior demonstrated the "pattern of conduct by defendant" required to show a violation of § 58–63–15(11)(f). *Gray I,* 132 N.C.App. at 70, 510 S.E.2d at 401. The effect of the North Carolina Court of Appeals's decision was to require that a plaintiff utilizing § 58–63–15(11)(f) as the basis of an UDTPA claim must establish a showing that the insurance company engaged in the practice with the frequency of a general business practice.

The *Gray I* plaintiffs, nevertheless, appealed this North Carolina Court of Appeals decision to the North Carolina Supreme Court, arguing that they had presented evidence demonstrating that the defendant violated § 75–1.1 because its conduct satisfied all of the elements of a § 58–63–15(11)(f) violation, including the frequency requirement and, in the alternative, that the defendant violated

---

7. The specific facts supporting the *Gray II* plaintiffs' claim under § 58–63–15(11)(f) involved a claim that the plaintiffs submitted to the defendant insurance company for hurricane damage. In greater detail, the plaintiffs claimed that the defendant included a Georgia B. Gray as a payee on all of the payments for the plaintiffs' covered hurricane damage claims even though Ms. Gray was not listed as a payee under the policy. *Gray II,* 352 N.C. at 64, 529 S.E.2d at 679. Although the plaintiffs informed the insurance company that Ms. Gray's name was on the check in error for she was not a listed payee and had no claim to the property, the insurance company continued to include Ms. Gray's name on all payments. *Id.* The plaintiffs then brought suit, asserting that the defendant insurance company, by including Ms. Gray's name on all payments, violated § 75–1.1 as a matter of law because the insurance company failed to comply with § 58–63–15(11)(f) when it did "[n]ot attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." N.C.Gen.Stat. § 58–63–15(11)(f).

§ 75–1.1 separate and apart from any violation of § 58–63–15(11). *Gray II,* 352 N.C. at 66–67, 529 S.E.2d at 680. Relying on the plaintiffs' latter argument, the North Carolina Supreme Court reversed the North Carolina Court of Appeals's decision because the "defendant violated N.C.G.S. § 75–1.1 separate from and not based upon a violation of N.C.G.S. § 58–63–15(11)." *Id.* at 67, 529 S.E.2d at 680–81.

In support of its decision, the North Carolina Supreme Court endorsed "the practice of looking to N.C.G.S. § 58–63–15(11) for examples of conduct to support a finding of unfair or deceptive acts or practices." *Id.* at 71, 529 S.E.2d at 683. Turning then to subsection (f) of § 58–63–15(11), the *Gray II* court stated that an insurance company who fails to comply with this provision "engages in conduct that embodies the broader standards of N.C.G.S. § 75–1.1 because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." *Id.* (citing *Marshall,* 302 N.C. at 548, 276 S.E.2d at 403). Because the conduct described in § 58–63–15(11)(f) by itself qualified as an unfair and deceptive trade practice, the Court reasoned that it was not necessary to require a plaintiff to additionally establish that the conduct occurred with any frequency. *Id.* at 71, 529 S.E.2d at 683. Accordingly, the *Gray II* court ruled that "such conduct that violates subsection (f) of [N.C.Gen.Stat.] § 58–63–15(11) constitutes a violation of [N.C.Gen.Stat.] § 75–

1.1, as a matter of law, without the necessity of an additional showing of frequency indicating a 'general business practice.' " [8] *Id.* (quoting N.C.Gen.Stat. § 58–63–15(11)).

As the interpretation of § 75–1.1 and § 58–63–15(11) is a question of state law, the North Carolina Supreme Court is the controlling authority for this matter. However, although Plaintiff acknowledges that the Court is required to follow the North Carolina Supreme Court's decisions on state law, it interprets *Gray II* differently from the Court's above summary in two material ways. First, Plaintiff asserts that the holding of *Gray II* is limited to the particular factual background of that case. (Pl.'s Brief Addressing Issues Remanded to the District Court by the Fourth Circuit Court of Appeals at 5 (quoting *Gray II,* 352 N.C. at 71, 529 S.E.2d at 683).) In the alternative, Plaintiff argues that *Gray II* should only apply if the party asserting a § 75–1.1 violation can first demonstrate that the specific alleged behavior satisfies § 58–63–15(11)(f) *and* is particularly immoral, unethical, oppressive, unscrupulous, or substantially injurious or, in the alternative, involved substantial aggravating circumstances. The Court finds that neither of Plaintiff's contentions are supported by the plain language of the North Carolina Supreme Court's *Gray II* opinion. To the contrary, the North Carolina Supreme Court stressed that the conduct described in § 58–63–15(11)(f) violates § 75–1.1 "as a

---

**8.** It is necessary to emphasize that *Gray II's* holding pertains to a § 75–1.1 violation based upon § 58–63–15(11)(f), and not a violation of § 58–63–15(11)(f) itself. § 58–63–15(11)(f) forecloses any private right of action based on itself alone by stating that "no violation of this subsection shall of itself create any cause of action in favor of any person other than the Commissioner." N.C.Gen.Stat. § 58–63–15(11). *Gray II* and all of the subsequent cases applying *Gray II* involve private parties

who merely utilize § 58–63.15(11)(a–n) in connection with their § 75–1.1 violation, which does allow an injured private party a right for redress. The Court notes, therefore, that the decisions made by *Gray II* and subsequent courts regarding § 75–1.1 violations based on § 58–63–15(11) do not change § 58–63–15(11)(a–n)'s frequency requirement that must be established by an appropriate party authorized to bring a cause of action asserting a violation of § 58–63–15(11)(a–n) itself.

matter of law" because "such conduct is *inherently* unfair, unscrupulous, immoral, and injurious to consumers." *Gray,* 352 N.C. at 71, 529 S.E.2d at 683 (emphasis added). In addition, given the clear language of the North Carolina Supreme Court that its decision is one of law, Plaintiff's arguments are also unpersuasive to the extent that they suggest that *Gray II's* holding relied on particularly egregious facts or aggravating circumstances.[9] With these arguments of Plaintiff addressed, the Court will now apply the North Carolina law, as interpreted by the *Gray II* court, to the facts of the instant case.

### C. Defendants' Counterclaim under UDTPA

#### 1. Defendants' § 75–1.1 Counterclaim Based on N.C.Gen.Stat. § 58–63–15(11)(f)

In support of their § 75–1.1 counterclaim, Defendants assert that Plaintiff engaged in several of the unfair claim settlement practices described in § 58–63–15(11), including § 58–63–15(11)(f), the unfair claim settlement practice at issue in *Gray II.* As mentioned above, subsection (f) of § 58–63–15(11) states that an unfair claim settlement practice occurs when an insurance company does "not attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." N.C.Gen.Stat. § 58–63–15(11)(f).

To demonstrate that Plaintiff committed this unfair trade practice, Defendants assert that Plaintiff refused to settle or even present an offer as to Defendants' business income coverage claim even after Plaintiff recognized its liability under this policy.

More specifically, Defendants assert that, as early as April 26, 1996, Plaintiff had taken the position that the business income coverage provided rental value coverage to Defendants for the period from February 3, 1996 through May 5, 1996. (Dep.Ex. 74, Letter from Chandler to Foster, April 26, 1996) Defendants further present the testimony of Susan Smith ("Smith"), Plaintiff's agent, that a calculation of rental value coverage only required proof of Cotton Mill's rental income, including the fair rental value of the portion of Cotton Mill occupied by Defendants, and the amount of certain legal obligations of the tenants, such as utility expenses. (S. Smith April 21, 1999 Dep. at 94; Westchester Cotton Mill Insurance Policy, Business Income Coverage Form, at 6.) Defendants assert that they supplied this information to Plaintiff, as evidenced by a June 19, 1996 correspondence between Plaintiff and its adjustor that included the necessary figures. (Dep.Ex. 74 at 3.) Pointing to these alleged facts, Defendants then contend that by June 19, 1996, Plaintiff's adjustor had obtained a list of the leases and, accordingly, Westchester should have made an offer on the claim at that time. (Smith July 28, 1999 Dep. at 87.) Defendants do admit that they disagreed with Plaintiff from the beginning about the time period covered under the business income policy. Nevertheless, they assert that Plaintiff should have at least made an offer to Defendants based on its interpretation of the policy, instead of engaging in what Defendants characterize as delaying tactics for over two years.

■ The Court finds, however, that Defendants' argument does not accurately

---

**9.** Similarly, to the extent Plaintiff argues that the *Gray II* decision relies on the plaintiffs' ability to show that the company had engaged in this practice with the frequency of a general business practice, the *Gray II* court emphasized repeatedly that the conduct described in

§ 58–63–15(11)(f) "constitutes a violation of N.C.G.S. § 75–1.1, as a matter of law, without the necessity of an additional showing of frequency indicating a 'general business practice.'" *Gray II,* 352 N.C. at 71, 74, 529 S.E.2d at 682, 684.

represent their interactions with Westchester, in light of the proof presented to the Court by the parties. For example, the June 19, 1996 correspondence that Defendants assert includes all the needed information to settle their business income claim did not in fact provide an accurate summary of the necessary information. Rather, Plaintiff's adjustor stated in the letter accompanying the June 19, 1996 correspondence that, while he had received lease information for fifteen to eighteen tenants, he was waiting for additional information because the rental income based on these leases was less than half of Defendant Johnson's estimate of $560,000 of annual revenue. (Dep.Ex. 74 at 3 ("[T]here were more tenants in this building that we have no information on.")) Accordingly, the June 19, 1996 correspondence does not demonstrate that Plaintiff had obtained all the information needed to settle the business income claim. Although Defendants also assert in general terms that Plaintiff requested multiple unnecessary documents as a stalling technique, Defendants have not sufficiently supported this claim by proof demonstrating that the requests for additional documents were unnecessary.[10]

Furthermore, the proof presented to the Court, which the Court will now summarize, demonstrates that Plaintiff engaged in multiple communications, first with Defendants' adjustor and then with their lawyer, in a good-faith attempt to process Defendants' business income claim without unnecessary delay. Although the fire occurred in February of 1996, Defendants did not make a formal request under the business income policy until March 26, 1997, when they, through their attorney, informed Plaintiff that they were entitled to receive the policy limit of $300,000 for their business income claim. Plaintiff responded to this request on May 20, 1997, by requesting an opportunity to conduct an examination under oath of Defendant Johnson, as was its right under the policy. After several scheduling conflicts, the examination under oath ultimately was conducted on November 7, 1997. On December 31, 1997, Plaintiff asked Defendants to submit a final sworn statement in proof of loss for their claims under both the business income policy and the property damage policy. Defendants responded in writing on January 13, 1998 and agreed to submit this final sworn statement in proof of loss, which Plaintiff received by April 7, 1998. However, the information in the March 16, 1998 sworn statement in proof of loss included an estimate of more than $2,500,000.00 in property damage, which greatly exceeded the Defendants' earlier estimates of damage. Because of the high claims in the March 16, 1998 sworn statement in proof of loss, Plaintiff wrote Defendants on April 7, 1998 and requested an opportunity to again examine Johnson under oath. Plaintiff acknowledged in the letter that, under the policy, Plaintiff was required to provide its position on coverage within thirty days after receipt of the sworn statement in proof of loss, but asked for an extension of this deadline to include fifteen days after conducting the examination under oath of Johnson. Although Defendants initially agreed to Plaintiff's request for an extension, the second examination did not occur because of scheduling conflicts. It was only in a July 24, 1998 letter that Defendants informed Plaintiff that they were withdraw-

---

**10.** To the extent Defendants rely on statements made by Smith, Plaintiff's agent, in her depositions regarding what information is needed to resolve a business income claim, the Court has previously determined in its January 6, 2000 Memorandum Opinion that Smith's statements do not demonstrate that Plaintiff knowingly requested additional and unnecessary information. (January 6, 2000 Mem. Opinion [Document # 100] at 18–19.)

ing their agreement to give Plaintiff an extension of time to respond to the March 16, 1998 sworn statement in proof of loss. Defendants at that point requested a decision as to Defendants' business income claims within fifteen days.

As the above summary of the interactions between the parties demonstrates, the undisputed facts of this case differ from the facts in *Gray II* that demonstrated a bad faith refusal to settle. In *Gray II*, the insurer, by insisting on including an additional payee on all payments, was inserting a condition that was not authorized by the insurance contract. In contrast, Defendants have not demonstrated that Plaintiff similarly circumvented the written language of the policy, particularly in light of Plaintiff's frequent correspondence with Defendants and Defendants' agreement to Plaintiff's proposal to submit its settlement offer on the business income claim after Johnson's second examination under oath. Rather, the Court finds that the instant case more closely resembles a recent unpublished Fourth Circuit case, *Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.,*[11] 11 Fed.Appx. 225, 234, 2001 WL 565317 (4th Cir. May 25, 2001). In *Topsail*, the Fourth Circuit found that subsection (f) of § 58–63–15(11) was not implicated when an insurer delayed payment on a claim in order to reasonably question the insured's damage estimates. *Topsail*, 11 Fed.Appx. at 234, 2001 WL 565317 *6. The Fourth Circuit noted that "[b]ecause Zurich had reasonable bases to challenge the validity of Topsail's submitted claim, [*Gray II*] is not controlling." *Topsail*, 11 Fed.Appx. at 234, 2001 WL

565317 *6. Similar to the Fourth Circuit's determination in *Topsail*, this Court also finds that there is no material issue of fact suggesting that Plaintiff did not in good faith work to settle Defendants' claim fairly and equitably. To the extent that there were delays, the evidence presented to the Court suggests that the delays were based on scheduling problems and Plaintiff's concerns regarding the unexpectedly large monetary request in Defendants' March 16, 1998 sworn statement in proof of loss. Accordingly, as the Court has not been presented with proof supporting an inference that Plaintiff did not act in good faith to settle a claim for which liability was reasonably clear, the Court concludes that Defendants have not demonstrated that Plaintiff engaged in the conduct proscribed by subsection (f) of § 58–63–15(11). Defendants therefore have not satisfactorily supported their § 75–1.1 claim based on § 58–63–15(11)(f) for summary judgment purposes.

2. Defendants' § 75–1.1 Counterclaim Based on § 58–63–15(11)(m)

As an additional basis for their § 75–1.1 counterclaim, Defendants also assert that Plaintiff has committed the unfair claim settlement practice proscribed by § 58–63–15(11)(m), which classifies as an unfair practice the failure to "promptly settle claims where liability has become reasonably clear[ ] under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage." N.C.Gen. Stat. § 58–63–15(11)(m). As support for

---

11. *Topsail* is an unpublished Fourth Circuit opinion and is therefore not binding precedent on this Court. Fourth Cir.Ct. of Appeals Local R. of App.P. 36(c). However, as the *Topsail* decision is one of only two cases that have involved a § 75–1.1 claim based on § 58–63–15(11) subsequent to the North Carolina Supreme Court's *Gray II* decision, the

Court will consult *Topsail* as persuasive authority on the issue currently before the Court. *See, e.g.,* HealthSouth *Rehabilitation Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1009 n. 1 (4th Cir.1996) (utilizing an unpublished Fourth Circuit opinion as persuasive authority).

this contention, Defendants rely on the proof they presented in support of their § 58–63–15(11)(f) claim and argue that Plaintiff delayed settling the business income claim in order to influence the property damage claim. For the reasons already explained in its discussion of § 58–63–15(11)(f), the Court finds that there is no issue of fact suggesting that Plaintiff's delay in processing the claims was attributed to bad faith or to a desire to improperly influence Defendants' property damage claim. The Court therefore concludes that Defendants have not established that a genuine issue of material fact precludes summary judgment on their § 75–1.1 counterclaim, to the extent that they base this counterclaim on the unfair claim settlement practice proscribed by N.C.Gen. Stat. § 58–63–15(11)(m).

### 3. Defendants' § 75–1.1 Counterclaim Based on § 58–63–15(11)(a)

Notwithstanding the Court's decision that Defendants have not demonstrated a § 75–1.1 claim based on § 58–63–15(11)(f) or § 58–63–15(11)(m), Defendants also contend that Westchester committed an unfair claim settlement practice by "misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue." N.C.Gen.Stat. § 58–63–15(11)(a). Defendants assert the following instances of misrepresentations that they believe constitute unfair claim settlement practices: 1) Plaintiff allegedly misrepresented the date that Cotton Mill could have resumed operations, and 2) Plaintiff's employee misrepresented what information

Defendants needed to submit for their claim under the business income policy.

First, Defendants argue that Plaintiff misrepresented to Defendants the date that Cotton Mill could reopen to the public. In an April 26, 1996 letter to Defendants' adjustor, Plaintiff's adjustor, Chandler, wrote that if Defendants had agreed to use a temporary fuse link system that would then be replaced by the rebuilt switch gear system, "the entire center could have resumed business as normal" by April 5, 1996. (Dep.Ex. 108 ¶ 3.) Chandler's letter also suggests that the City of Greensboro had agreed to allow Cotton Mill to be opened to the public while using the temporary fuse link system. *Id.* Westchester then utilized Chandler's dates to establish the appropriate time period for the business income policy, which reimbursed Defendants for lost business income during the period it would reasonably take for repairs,[12] and asserted that the policy provided for reimbursement of the business income lost between the date of the fire and May 5, 1996, thirty days after April 5, 1996.

█ Pointing to the statements in Chandler's April 26, 1996 letter, Defendants proffer proof demonstrating that these statements were false and that Chandler knew or should have known that Cotton Mill could not have reopened to the public by April 5, 1996. The Court need not further discuss Defendants' proof on this issue, however, because Defendants cannot meet one of the necessary elements for a § 75–1.1 counterclaim based on a misrep-

---

12. In its January 6, 2000 Memorandum Opinion accompanying its Order and Judgment, this Court held:

[The Policy] provides business income coverage only for the period from the date of the fire until the date on which Defendants should have repaired the physical damages to the premises caused by the fire using reasonable speed, whether or not the prop-

erty was actually repaired. The Court offers no opinion on the particular length of that period in this case because neither party has presented sufficient facts in their briefs to support a claim of when physical damages to Cotton Mill caused by the fire should have been repaired using reasonable speed.

(January 6, 2000 Mem. Opinion at 28–29.)

resentation. Under the provision of UDTPA that authorizes a private right to sue, the party bringing suit must "be injured ... by reason of any act or thing done" in violation of UDTPA. N.C.Gen.Stat. § 75–16. When a § 75–1.1 claim is based on a violation of § 58–63–15, the North Carolina courts have required that the plaintiff "suffer[ ] actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *Pearce,* 316 at 471, 343 S.E.2d at 180.[13] As applied by the courts, this requirement is similar to the element of "detrimental reliance" needed to establish a claim of common law fraud. *Id.; Wysong & Miles Co. v. Employers of Wausau,* 4 F.Supp.2d 421, 433 (M.D.N.C. 1998). The Court therefore concludes that a violation of § 75–1.1 based on the conduct proscribed by § 58–63–15(11)(a) requires a demonstration that Defendants detrimentally relied upon the misrepresentation.

■ A review of the proof presented to the Court demonstrates that Defendants were not injured by Chandler's alleged misrepresentation. Defendants do not and cannot successfully allege that they relied on Chandler's statements that Cotton Mill could have resumed business by April 5, 1996, because throughout this litigation they have asserted that the business income policy covered a much longer period of time. (Defs.' Brief Addressing Issues Remanded to the District Court at 8.) Instead, Defendants argue that they were injured because Chandler's alleged misrepresentations were designed to force Cotton Mill to reopen prematurely, in order to shorten Westchester's liability for the business income claim. However, the Court finds Defendants' argument unpersuasive, for the undisputed facts demonstrate that in early April of 1996, Defendants had informed Chandler that they did not intend to reopen Cotton Mill—*before* Chandler's April 26, 1996 letter suggesting that the business income policy would only cover business income for a ninety-day period. (Dep.Ex. 41, April 9, 1996 Letter from Carl Johnson to Artistic Impressions.) Given that they had already decided not to reopen, Defendants cannot now claim that they were injured because Chandler's letter pressured them to reopen early. The Court therefore finds that, without proof of proximately-caused injury, Defendants cannot sufficiently support a § 75–1.1 claim pursuant to § 58–63–15(11)(a) based on Chandler's statements in his April 26, 1996 letter regarding the length of time covered by the business income policy.

As a second example of Plaintiff's misrepresentations purportedly in violation of § 58–63–15(11)(a), Defendants assert that Plaintiff misrepresented what information was necessary to settle Defendants' business income claim. More specifically, Defendants assert that Smith, Plaintiff's agent, stated in her July 1999 deposition that Westchester had obtained the information needed to process the business income claim early in the claim settlement process. Defendants further assert that this statement directly contradicted Smith's statement at her April 1999 deposition that the business income claim was delayed because Plaintiff had not yet received all of the necessary information.

On this matter, the Court notes that it has previously reviewed these allegations in great detail in its January 6, 2000 Mem-

---

13. In *Pearce,* the plaintiff's UDTPA claim rested on a violation of N.C.Gen.Stat. § 58–54.4, the predecessor of N.C.Gen.Stat. § 58–63–15. This section, now codified in § 58–63–15(1), defined as an unfair and deceptive insurance practice the "[m]aking, issuing, circulating, or causing to be made, issued, or circulated, any ... statement misrepresenting the terms of any policy issued ... or the benefits or advantages promised thereby ..." N.C.Gen.Stat. § 58–54.4.

orandum Opinion. In its discussion, the Court found that Smith's comments in her July 1999 and her April 1999 depositions were not inconsistent with each other. (Jan. 6, 2000 Mem. Opinion at 18–19.) Furthermore, the Court noted that Smith had explained that the delay in processing Defendants' business income claim arose because Plaintiff was waiting for Defendants to submit a claim for their losses, not because it was awaiting additional documents. *Id.* Accordingly, the Court concludes that its earlier ruling controls on this issue and that Smith's statements regarding the information needed for the business income claim do not qualify as misrepresentations. Given the Court's determination that the statements by Smith and by Chandler cannot support an UDTPA violation based on § 58–63–15(11)(a), Defendants' § 75–1.1 counterclaim cannot survive summary judgment based on this unfair claim settlement practice.

   4. Defendants' § 75–1.1 Counterclaim based on § 58–63–15(11)(*l*)

■ As their final basis for their § 75–1.1 counterclaim, Defendants assert that Plaintiff "delay[ed] the investigation or payment of claims by requiring an insured claimant, or the physician, of [or] either, to submit a preliminary claim report and then requiring the subsequent submission of formal proof-of-loss forms, both of which submissions contain substantially the same information." N.C.Gen.Stat. § 58–63–15(11)(*l*). The Court notes, however, that Defendants have not alleged that they were required to submit a preliminary claim report. Rather, Defendants attempt to use § 58–63–15(11)(*l*) as a basis for classifying as an unfair claim settlement practice Plaintiff's requests for an exami-

nation of Defendant Johnson under oath, for a submission of a sworn statement in proof of loss, and then for a second opportunity to examine Defendant Johnson under oath.[14]

The Court notes its initial concern with Defendants' application of § 58–63–15(11)(*l*), for the Court has not been presented with any authority suggesting that this subsection should be read so broadly as to include the use of other combinations of claim settlement practices besides the two specifically mentioned in the statute. Moreover, even if the statute is subject to such an interpretation, Defendants would still need to meet the statute's requirement that the insurance company requested additional information that was "substantially the same" in order to delay the claim settlement process. N.C.Gen.Stat. § 58–63–15(11)(*l*). However, in this instance, the information requested was not substantially the same. In fact, Defendant Johnson's sworn statement in proof of loss provided different information and differed substantially from his earlier examination under oath, and it was because of this substantially increased claim for damages that Plaintiff requested the second examination under oath. Accordingly, the Court finds that Plaintiff's requests for a second examination under oath after its receipt of the March 16, 1998 sworn statement in proof of loss and the November 7, 1997 examination under oath of Defendant Johnson does not qualify as conduct prohibited by § 58–63–15(11)(*l*).

## III. CONCLUSION

■ As the Court has discussed above, Defendants have not been able to suffi-

---

**14.** Defendants also assert generally that Plaintiff had in its possession unspecified reports containing the information that it was asking Defendants to provide. As its proof, Defendants rely on the statements made by Smith in her April 1999 and July 1999 depositions and discussed above in Part II.C.3. Again, the Court finds that its determination in its January 6, 2000 Memorandum Opinion on this issue forecloses Defendants' argument.

ciently support their claim that Plaintiff violated § 75–1.1 pursuant to the unfair claim settlement practices described in § 58–63–15(11)(a), (f), (*l*), and (m). Because Defendants cannot demonstrate that Plaintiff acted in a way proscribed by § 58–63–15(11)(a), (*l*), or (m), it is unnecessary for the Court to further determine whether a § 75–1.1 UDTPA violation can be stated based on a single violation of the listed provisions of § 58–63–15(11)(a), (*l*), and (m) in the same manner that the *Gray II* court authorized for § 58–63–15(11)(f).[15] The Court therefore completes its review of the remanded issues and concludes that Plaintiff's Motion for Partial Summary Judgment is GRANTED as to Defendants' § 75–1.1 counterclaim to the extent the counterclaim relies on § 58–63–15(11)(a), (f), (*l*), and/or (m). As there are no further claims of the parties before the Court, the lawsuit is dismissed in all respects.

An Order and Judgment consistent with this Memorandum Opinion shall be filed forthwith.

### ORDER AND JUDGMENT

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Plaintiff's Motion for Partial Summary Judgment is GRANTED as to Defendants' counterclaim of unfair and deceptive trade practices, N.C.Gen.Stat. § 75–1.1, to the extent the counterclaim relies upon N.C.Gen.Stat. § 58–63–15(11)(a), (f), (*l*), and/or (m). As no other issues remain before the Court, the Court now dismisses the case in its entirety.

**15.** Although the Court need not reach this issue for its holding, inasmuch as the Fourth Circuit specifically instructed the Court to consider whether § 58–63–15(11)(a), (*l*), and (m) can be used to establish a § 75–1.1 violation in the same manner as § 58–63–15(11)(f), the Court will address it briefly. While the North Carolina Supreme Court has not yet determined whether *Gray II's* reasoning with respect to § 58–63–15(11)(f) applies equally to the other lettered subsections in § 58–63–15(11), a recent decision by the North Carolina Court of Appeals, *Country Club of Johnston County, Inc. v. U.S. Fid. & Guar. Co.*, 563 S.E.2d 269 (2002), did reach this issue and determined that "the other prohibited acts listed in N.C.Gen.Stat. § 58–63–15(11) are also acts which are unfair, unscrupulous, and injurious to consumers, and that such acts therefore fall within the 'broader standards' of N.C.Gen.Stat. § 75–1.1." *Country Club*, 563 S.E.2d 269, 279. Accordingly, the North Carolina Court of Appeals's ruling extends the reasoning of *Gray II* to apply to all of the lettered subsections in § 58–63–15(11).

The Court notes that the approach taken by the North Carolina Court of Appeals is a reasonable reading of *Gray II* but is not the only reasonable interpretation. In fact, this Court would prefer to compare the unfair claim settlement act in each of the lettered subsections of § 58–63–15(11) with the conduct proscribed by § 58–63–15(11)(f) in order to determine if the other lettered subsections are similarly inherently "unfair, unscrupulous, and injurious to consumers." *Gray II* at 71, 529 S.E.2d at 683. Nevertheless, despite this difference of interpretation, the North Carolina Court of Appeals has considered and addressed this issue first, and there is no indication that the North Carolina Supreme Court would overrule *Country Club*. For these reasons, the Court therefore will, with reserved deference, follow *Country Club's* lead and rule that a plaintiff can establish a § 75–1.1 violation by demonstrating that the insurer engaged in the conduct defined in subsections (a), (*l*) and (m) of § 58–63–15(11) without establishing any frequency requirement.